UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════════

UNITED STATES OF AMERICA,


v.                                    **DECISION AND ORDER**
                                       18-MR-382


ELIZABETH HARRISON,

                        Defendant.

═══════════════════════════════════════

　　　　Defendant Elizabeth Harrison is charged in a Criminal Complaint with one

count of cyberstalking in violation of 18 U.S.C. § 2261A(2) and one count of making

a false statement in violation of 18 U.S.C. § 1001(a)(2).  The charges arise from

defendant Harrison's alleged threatening harassment of an Assistant United States

Attorney ("AUSA") and from the defendant's alleged false denial of her name when

she was confronted by federal law enforcement officers about the alleged

cyberstalking.  The United States contends the defendant was retaliating against the

victim AUSA[1] for twice having prosecuted the father of two of the defendant's

children.

　　　　The United States has moved pursuant to 18 U.S.C. § 3145(a)(1) to revoke a

decision of Magistrate Judge H. Kenneth Schroeder, Jr., that denied the United

States' motion to detain defendant Harrison pending trial and ordered her pretrial

release.  On November 8, 2018, the Court stayed the release order pending

───────────────────

　　　　[1]  The term "victim AUSA" refers to a federal prosecutor whose identity is known to the
defendant and the Court.

disposition of the United States' motion to revoke the order. The Court heard oral argument and proffers from the parties on November 14, 2018.

For the reasons that follow, the Court finds that the defendant is a danger to the community and the victim AUSA, and that no release condition or combination of conditions available to the Court will reasonably assure the safety of the community and the AUSA. The United States' motion pursuant to 18 U.S.C. § 3145(a)(1) to revoke the November 7, 2018 pretrial release order is therefore granted and the defendant is ordered detained pending trial.

## INTRODUCTION

**Background.** In 2001, defendant Harrison was convicted of a violent assault (a stabbing) in violation of New York Penal Law § 120.05(2). According to a police report about the stabbing, defendant was known by a street name, "Dynamite." She used that street name in a salacious text message to the victim AUSA. Dkt. No. 6-5, pp. 16-18. She has a felony forgery conviction from the same time period as the stabbing conviction, but no record of violence or other serious criminal activity since then.

Defendant Harrison is the single mother of four children (ages 15, 13, 11, and 7). She has worked "at a lot of places[2]" as a cook and has done warehouse work. According to the Pretrial Services Report, she does not have enough earnings to support herself and her four children, and she does not receive any child support payments. Nevertheless, the defendant uses marijuana daily even though she was

---

[2] Pretrial Services Report, p. 2.

required to attend substance abuse treatment in 2016 in connection with some sort of Family Court proceeding.  She reports suffering depression intermittently for about 7 years.  On average, the defendant has moved her residence within the City of Buffalo about once a year during the same roughly seven-year time period.

In 2011, and again in 2017, the victim AUSA prosecuted Amilcar Ramos, who is the father of the two youngest of defendant Harrison's children, in two separate cases.  The first prosecution in 2011 was a state case for an armed robbery of a drug dealer; Ramos was convicted after a jury trial of participating in tying up the drug-dealer's family, including children, and holding them at gunpoint, in connection with the robbery.

At that time, the AUSA was an Assistant District Attorney for Erie County, in this District.  Ramos was sentenced to 25 years' imprisonment.  Defendant Harrison and some of Ramos' family members were heard referring to the AUSA during that prosecution as the "white devil" or the "blue-eyed white devil."  18-MJ-176, Dkt. No. 3, p. 4, ¶ 8; Dkt. No. 8, p. 9.

In late October of 2017, approximately two weeks before jury selection for Ramos' trial during the second prosecution handled by the victim AUSA, which involved federal charges arising from a 2009 kidnaping, robbery, extortion and murder of another drug dealer[3], law enforcement officers received an anonymous

---

[3]  The charges against Ramos and his alleged co-conspirators arose from their December, 2009, participation in kidnaping a suspected drug dealer, robbing him, putting him in the trunk of a car, taking him to a park and shooting him in the head.  Ramos was not named in the substantive charge of discharging a firearm causing death, or of conspiring to do so, that some of his co-defendants faced.  Dkt. 12-CR-83-S, No. 155.

tip.  The tip was in a letter addressed to the City of Tonawanda, New York, police department.  The letter stated that Ramos' mother, Helene Arroyo, and others, all led by Ramos, were "planning to make a massacre."  The tip stated that "the weapons" were in a storage unit rented in Arroyo's name at "'LIFE STORAGE' in Tonawanda, N.Y."  It listed Arroyo's telephone number, and said, ". . . you can get her."  17-MJ-5294, Dkt. No. 1, p. 3, ¶ 4.

No other individuals, including defendant Harrison, were named in the anonymous tip letter; however, the defendant had been in frequent contact with Ramos, who is in a state prison in Malone, New York, several hours from Buffalo. The defendant relied on an alias, "Tonya Hunt," to place calls to Ramos in the state prison facility in Malone, using the same difficult-to-trace voice-over-internet telephone number the defendant eventually admitted using to contact the victim AUSA.  Dkt. No. 6-4, p. 2; Dkt. No. 3, p. 10, ¶ 30.  In addition, prison records show that the defendant visited Ramos in the state prison facility using her own name at least a few times in the months before the anonymous tip was received.  Dkt. No. 6-4, pp. 7-8.

As a result of the anonymous tip, law enforcement officers obtained a search warrant for the numbered storage unit rented in Arroyo's name at a Life Storage location in Tonawanda, New York.  17-MJ-5294, Dkt. No. 1.  Officers found and seized a semi-automatic M-4 rifle, a .25 caliber semi-automatic pistol with a defaced serial number, and more than 500 rounds of ammunition.  *Id.*  The ammunition included several full 30-round magazines for the M-4 and a total of more than 300

rounds for the M-4.  *Id.*

The day after the weapons and ammunition were found, Arroyo spoke to a Federal Bureau of Investigation Special Agent during a recorded phone call.  After denying that she had known there were weapons in her storage unit, Arroyo admitted that she did know it.  She volunteered that they had been there "a long time," but when asked to identify the weapons that she was aware of, Arroyo responded, "I ain't gonna say."  17-MJ-5294, Dkt. No. 1, pp. 5-6, ¶ 13.  Arroyo refused to speak further before she could be questioned about a "massacre."  *Id*.

Arroyo was charged in a federal criminal complaint with violating 18 U.S.C. § 922(k) for possession of the pistol with the defaced serial number.  17-MJ-5294, Dkt. No. 1.  While that charge was pending, Ramos was acquitted of all charges in the second prosecution handled by the victim AUSA.  About a month later, the federal § 922(k) charge against Arroyo was dismissed after she entered a guilty plea in state court to a New York firearm charge based upon possession of the pistol with a defaced serial number.  No evidence directly implicating defendant Harrison in firearms possession or in "planning to make a massacre" has been proffered by the United States.

In a November 7, 2018 decision in this case, Magistrate Judge H. Kenneth Schroeder, Jr., denied the United States' motion to detain defendant Harrison and instead conditionally granted the defendant pretrial release on electronic monitoring.

The Magistrate Judge found the defendant a danger[4], but he orally ordered the defendant, who is age 39, released to home detention in her mother's residence. The defendant would be subject to global-positioning electronic monitoring and strict restrictions on her telephone and internet use, and, among other conditions, she would seek and maintain employment, abstain from alcohol, marijuana, and other unprescribed controlled substance use, undergo a mental health evaluation and any necessary mental health treatment, and have no contact with the victim AUSA or Ramos. Dkt. No. 8, pp. 43-49, 51-54.

In support of its motion to revoke the pretrial release order the United States argues that defendant Harrison is a flight risk and a danger to the community and to the victim AUSA. It maintains that the defendant's alleged cyberstalking involved a course of conduct that shows that the defendant intended to harm the AUSA. The United States argues that releasing the defendant will endanger the public and the AUSA.

During argument of the United States' motion pursuant to 18 U.S.C. § 3145(a) to revoke the pretrial release order and to detain defendant Harrison, her counsel argued that the alleged offenses are not very serious, and — while admitting how improbable it seems — argued that the defendant's course of conduct shows that she has fallen in romantic love with the victim AUSA. Her counsel suggests that as long as the defendant gets substance abuse and mental health treatment, the

---

[4]  The Magistrate Judge stated: "[a]ll of those facts and circumstances and that history as I've iterated in the context that I've iterated cause me to conclude that this defendant does constitute a threat of danger." Dkt. 6-1, p. 39.

conditions of pretrial release imposed by the Magistrate Judge are sufficiently stringent to protect the community and the AUSA.

**The Alleged Course of Conduct.**  During an 11-day period beginning in late October 2018, defendant Harrison sent sexually-provocative and other text messages to, and had harassing phone contact with, the victim AUSA.  She had earlier attempted to contact the AUSA on October 2, 2018 on a Linkedin page using another alias, "Renate Green."  Dkt. No. 6-5, pp. 2-3.  When the AUSA did not respond, she attempted to contact the AUSA on a private telephone number on October 23rd.  She left some voice mails and text messages, and when later pressed by the AUSA during a brief telephone conversation to say how she had obtained the private number, she equivocated.  She later told law enforcement officers that she purchased the number and other personal information about the AUSA from an internet vendor, spokeo.com.

During the course of her salacious communications to the victim AUSA, the AUSA and law enforcement officers sought information in order to identify defendant Harrison.  The defendant eventually reminded the AUSA that the AUSA prosecuted Ramos seven-and-a-half years earlier, while the AUSA was an Assistant District Attorney.  Dkt. No. 6-5, p. 16.  The defendant reminded the AUSA of Ramos' street name, and she reminded the AUSA that the AUSA had subpoenaed her to be a witness against Ramos during the first trial.  *Id.* at pp. 16-17.

It was during the first prosecution of Ramos that defendant Harrison had been heard referring to the victim AUSA as the "white devil" and made it known that she

blamed the AUSA for Ramos' conviction and sentence to 25 years in state prison. One of her salacious text messages to the AUSA stated that Ramos is the only person she has ever "felt safe" with.  Dkt. No. 6-5, p. 14.  Another recounted that it was "7 yrs, 6mots n [*sic*] 15 days of loneliness"  since Ramos was sentenced to state prison.  Dkt. No. 6-5, p. 17.

During the sequence of text messages to the victim AUSA that explicitly offered sex, defendant Harrison sent the AUSA a photo of a woman that she claimed was her.  Dkt. No. 6-5, p. 15.  A short time later, the AUSA responded in a text message directing the defendant not to contact the AUSA again.  *Id.* at 16.  The defendant responded that she would not quit until she got what she wanted.  *Id.* at pp. 17-18.

When defendant Harrison's salacious communications failed to lure the victim AUSA into more contact with her, the defendant started to claim instead that she wanted to provide information to assist law enforcement.  Dkt. No. 6-6.  She said she wanted to assist with further investigation of the 2009 kidnaping, robbery, and extortion of the murdered drug dealer that had led to the second prosecution and the acquittal of Ramos.  She offered no information, however, and after the AUSA pressed the defendant to say how she obtained the AUSA's phone number, the defendant said, "that's not the only thing I have," but then she quickly claimed she had nothing else.  *Id.*

On November 2, 2018, when law enforcement agents knocked on the door of defendant Harrison's residence, she cracked the door and denied being Elizabeth

Harrison. She said her name was "Deborah." Dkt. 3, pp. 8-9. The defendant later truthfully identified herself while outside her residence, and she generally admitted her recent text messages and phone communications with the victim AUSA. She said it was her idea to contact the AUSA, and that she and "another woman" did so because they wanted to assist federal law enforcement in connection with the investigation of the 2009 kidnaping and murder. *Id.* at 9-10. She did not identify the other woman. *Id.*

**Detention and Revocation of Release.** Under the Bail Reform Act of 1984, a criminal defendant awaiting trial should be released on bail unless the defendant presents an unreasonable risk of flight or "will endanger the safety of any other person or the community." 18 U.S.C. §3142(b). Even though the law strongly favors pretrial release, and a defendant is presumed innocent through the conclusion of trial or acceptance of a plea of guilty, a defendant does not have an absolute right to be released on bail following an arrest. *United States v. Salerno*, 481 U.S. 739, 749 (1987).

Pursuant to 18 U.S.C. § 3142(f), the United States may move for pretrial detention of a defendant only in cases that fall into one of six specific categories. *United States v. Dillard*, 214 F.3d 88, 91 (2d Cir. 2000). Three of the six categories involve the nature of the crime charged, including crimes of violence, crimes for which the potential punishment is death or life imprisonment, or serious drug offenses. 18 U.S.C. § 3142(f)(1)(A)-(C). The other three categories involve cases in which the defendant has a particular set of prior criminal convictions, cases that

involve a serious risk of flight, and cases that involve obstruction of justice, witness tampering, or jury tampering.  18 U.S.C. § 3142(f)(2)(A)-(B).  If a defendant does not fall into one of the specific categories that permit detention, the defendant must be released ". . . no matter how obviously dangerous or how bent on committing an act of violence the [defendant] may be . . . ."  *Dillard*, 214 F.3d at 96; *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988).

If a defendant is ordered released by a magistrate judge, the United States may, under 18 U.S.C. § 3145(a)(1), move for revocation of the release order before the district court.  A motion to revoke release must "be determined promptly," 18 U.S.C. § 3145(a), and the district court "should not simply defer to the judgment of the magistrate, but [should] reach its own independent conclusion."  *United States v. Leon*, 766 F.2d 77, 80 (2d. Cir. 1985).  The district court performs a de novo review of the magistrate judge's release order.  *Id.*  When conducting such *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence.  *United States v. Colombo*, 777 F.2d 96, 98 (2d Cir. 1985).

In this case, the United States objects to defendant Harrison's pretrial release primarily on the ground that she poses a danger to the community and her alleged victim.  The United States has the threshold burden to show that the defendant is charged with an offense subject to pretrial detention.  18 U.S.C. § 3142(f)(1)(A) and (2)(B).  It has the burden to show by the standard of clear and convincing evidence that no pretrial release condition or combination of conditions will reasonably assure

the safety of the community or the AUSA.  *Id.*; *see United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985)[5].

Upon *de novo* review of the November 7, 2018 pretrial release order, the Court finds defendant Harrison is charged with a crime of violence and poses danger to the community and to the victim AUSA that requires that the defendant be detained pending trial.  The danger she poses is such that no combination of pretrial release conditions available to the Court will reasonably assure the safety of the community and victim AUSA.  Accordingly, for the reasons stated below, the United States' motion to revoke the pretrial release order is granted and the defendant shall be detained.

## DISCUSSION

In determining whether there are conditions of release that will reasonably assure the safety of the community or individual persons, the Court must consider the factors in 18 U.S.C. § 3142(g):

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including –

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of

---

[5]  The United States also argues that defendant Harrison is a serious risk of flight and that no conditions of her release would reasonably secure her appearance as required.  The Court does not agree, and because the Court grants the motion of the United States for revocation of release and grants detention on grounds of danger, the Court does not address the extent of the risk of flight that she poses.

residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

The Second Circuit has warned that, in applying these factors to any particular case, "the court should bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur,* 817 F.2d 189, 195 (2d Cir.) (*quoting* S. Rep. No. 225, 98th Cong., 2nd Sess. 7, reprinted at 1984 U.S.C.C.A.N. 3182, 3189); *see United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). Defendant Harrison's course of conduct, including her salacious contacts that were plainly intended to draw the AUSA to her in secret, her past use of aliases over the difficult-to-trace internet phone service, and her shifting explanations for her conduct, lead the Court to conclude that she is among the limited group of offenders who must be denied bail until trial.

**The Nature and Circumstances of the Offense.** As a threshold matter, defendant Harrison is not subject to pretrial detention unless she is charged with a crime of violence as that term is defined in 18 U.S.C. § 3156(a)(4) as:

(A) an offense that has an element of the offense the use,

> attempted use, or threatened use of physical force against the person or property of another;
>
> (B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense; or
>
> (C) any felony under chapter 77 [human trafficking], 109A [sexual abuse], 110 [sexual abuse and other exploitation of children], or 117 [human trafficking for sexual activity]; .
> . . .

*Id.* One of the two offenses the defendant is charged with, cyberstalking in violation of 18 U.S.C. § 2261A(2), has been found to be a crime of violence under this definition. *See*, *United States v. Grooms*, No. 3:15-mj-00025, 2015 WL 1982097, at * 2 (S.D.W. Va. Apr. 29, 2015).

The parties have not identified, and the Court has not located, any case law in this Circuit addressing whether cyberstalking in violation of § 2261A(2) is a crime of violence for § 3156(a)(4) purposes. And the Circuit has not had occasion to resolve whether a categorical approach (or a modified categorical approach) applies when assessing whether an offense qualifies as a § 3156(a)(4)(B) crime of violence. *See United States v. Dillard*, 214 F.3d 88, 92 (2d Cir. 2000)[6].

Defendant Harrison's counsel acknowledges the reasoning in *Grooms, supra,*

---

[6] A decision in this District, *United States v. Watkins*, 18-CR-131, 2018 WL 4922135 (W.D.N.Y. October 9, 2018), suggests in dictum that a 2006 Congressional amendment at 18 U.S.C. § 3147(f)(1)(E) which explicitly authorizes detention based upon a felon-in-possession charge under 18 U.S.C. § 922(g), and which was adopted to obviate a Circuit split over whether such a felon-in-possession charge is a § 3156(a)(4)(B) crime of violence, impliedly rejected the categorical approach tentatively applied in *Dillard*, 214 F.3d at 92. 2018 WL 4922135, at *2. In *United States v. Neuzil*, 09-CR-2020, 2009 WL 2030373, at * 2 (N.D. Iowa, July 13, 2009), a violation of 18 U.S.C. § 2216A(2)(A) was found to be a crime of violence based upon the underlying facts.

but also emphasizes that the actual course of conduct of the defendant in this case did not involve a direct threat of physical harm. Counsel points out that on-line harassment is routinely addressed in lower local courts, as if that means this alleged offense is not a serious offense. The defendant's emphasis on a narrow interpretation of the facts underlying the charge in this case overlooks that *Grooms* applied the same categorical approach that the Second Circuit employed in *United States v. Dillard*, 214 F.3d 88, 92 (2d Cir. 2000), to assess whether an offense is a crime of violence under the definition of the term in § 3156(a)(4)(B). On the limited arguments before the Court, the Court agrees with the reasoning in *Grooms* and finds cyberstalking in violation of 18 U.S.C. § 2261A(2) categorically involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense, so that pretrial detention is available pursuant to 18 U.S.C. § 3142(f)(1)(A) to address pretrial dangers posed by release of a defendant pending trial.

Turning next to the underlying circumstances of defendant Harrison's alleged cyberstalking offense, the Court weighs the victim's status as an AUSA who twice prosecuted Ramos and apparently engendered substantial animosity in the process. The circumstances before the Court show that the defendant's course of conduct was part of an attempt to retaliate against the victim AUSA for prosecuting Ramos. A person who tries to retaliate against a prosecutor or a law enforcement officer knows that they are highly likely to be incarcerated, if they are caught. The evidence and surrounding circumstances showing that the defendant acted to retaliate against

the AUSA despite knowing the risks is evidence of her determination to seriously retaliate, and it tends to show she is a danger.

Defendant Harrison was aware of the grave risks she was running; one of her early communications with the victim AUSA stated:

> I apologize for harassing n frightening U, no need to investigate, it won't happen again unless you want it?

[sic] Dkt. No. 6-5, p. 13. This text message reasonably appears to have been sent to disarm the AUSA so that the defendant could continue to seek to draw the AUSA closer to her. She knew her contacts would be frightening, given her and her associates' history with the AUSA, she conveyed a willingness to stop, and asked permission to continue. She did not get permission to continue contacting the AUSA, but she did continue. And she later said she would not stop until she got what she wanted. Her street name is "Dynamite."

Defendant Harrison used an alias, "Renate Green," to initiate contact with the victim AUSA. She also used a difficult-to-trace internet phone service associated with a different alias, "Tonya Hunt," to send text messages and to call the AUSA, and she only disclosed some identifying facts about herself to the AUSA when the AUSA feigned vulnerability to her offers of sex as part of an effort with investigating law enforcement officers to trick her to reveal information about herself. The defendant had researched the AUSA's background and purchased his private phone number from an internet vendor. The defendant's use of a false name in all the circumstances support a conclusion based upon all the surrounding facts that

retaliation was occurring. Moreover, the defendant's course of conduct was consistent with the intense animosity shown by the defendant who, along with some of Ramos' family members, referred to the AUSA as the "white devil" during the first prosecution of Ramos by the AUSA.

Contrary to defendant Harrison's arguments in opposition to revocation of the pretrial release order, the circumstances of the offense do not prompt mere speculation about what defendant Harrison was up to. The defendant attempted to draw the victim AUSA to her. The seizure of weapons and ammunition from Arroyo's storage unit and Arroyo's guilty plea in state court tend to corroborate the anonymous tip received by law enforcement that Ramos was leading plans for a "massacre" just before jury selection during the second prosecution of Ramos. While there is no direct evidence the AUSA was targeted by Ramos, Ramos' mother, Arroyo, or anyone associated with them last year, anyone in the AUSA's shoes, knowing the defendant's intimate and strong ties to Ramos, and having been demonized by the defendant and Ramos' family by being called the "white devil" and the "blue-eyed white devil," would have reasonably feared being targeted for serious physical injury or death.

At oral argument of the United States' motion to revoke, defendant Harrison's counsel proffered that defendant Harrison had fallen in romantic love with the victim AUSA. Having reviewed the defendant's communications with the AUSA and all the circumstances, the Court concludes that the defendant's claim that she has fallen in love with the AUSA is false. He was the "white devil" to her. One of her text

messages to the AUSA laments Ramos' absence from the defendant's life seemingly to the day since his imprisonment as a result of the first prosecution. Another mentions how Ramos is the only person she has ever "felt safe" with. Ramos is the father of her two youngest children. The onset of her symptoms of depression coincided with Ramos' imprisonment.

If defendant Harrison were in romantic love with the victim AUSA, the defendant might have avoided revealing her name when first contacting the AUSA. But she would not have used an alias. If she were in love with the AUSA, she would not have shifted to claiming to want to help in a murder investigation so easily — while still offering sex — when her advances were rebuffed by the AUSA. The Court finds the defendant's claim to have fallen in love with the AUSA is a ploy to avoid responsibility for her failed effort to draw the AUSA into close contact with her so that the AUSA could be harmed.

When the victim AUSA rejected the defendant's explicit sexual advances, she shifted immediately to claiming to want to help with the murder investigation. If the defendant had wanted to assist in a law enforcement investigation, when law enforcement officers knocked on her door and asked to speak to her, she would not have opened her door only a crack, denied her identity, and used another false name. And when the defendant sought to explain her harassing contacts with the AUSA to the law enforcement officers, she gave no description of how she might have helped investigate the murder of nearly nine years ago. Her course of conduct shows that the defendant was not contacting the AUSA for sex or to cooperate with

law enforcement to solve a murder.  Her shifting claims are part and parcel of her attempt to hide that she was trying to draw the AUSA to her in secret so that the AUSA could be harmed.

**The Weight of the Evidence.**  The evidence against defendant Harrison appears strong.  She eventually admitted her communications with the victim AUSA when questioned by law enforcement officers.  Records of her communications with the AUSA are preserved, and her use of aliases, demonstrably false excuses for her behavior, and relatively easily-marshaled circumstantial evidence of her motives to retaliate against the AUSA for prosecuting Ramos make it likely she will be convicted of the cyberstalking charge in the pending Criminal Complaint.

**History and Characteristics of the Defendant.**  Defendant Harrison is now 39 years of age.  Her criminal record involving a stabbing-related felony assault conviction and two felony forgery offenses is from approximately 17 years ago.  The stabbing was long ago, and the circumstances of that violent assault have not been proffered to the Court. But the defendant used a street name mentioned in a police report of the stabbing,  "Dynamite," in a text message to the victim AUSA.  She later demonized the AUSA by calling him the "white devil" during the first prosecution of Ramos.  There is some evidence her associates were planning a "massacre."  The defendant's record of serious violence is not too remote to matter in this context.

As mentioned previously, defendant Harrison suffers intermittent bouts of depression.  She has received some counseling within the last year or so.  The depression began around the time Ramos was sentenced to 25 years in state

custody after the first armed-robbery prosecution.

Defendant Harrison's love of Ramos, who is the father of two of the defendant's four children, contributed to her calling the victim AUSA the "white devil." Her text messages to the AUSA show that she misses Ramos greatly, and the Court concludes his imprisonment and absence contribute to her bouts of depression. The Court concludes her love of Ramos contributes to her desire to harm the AUSA.

Defendant Harrison graduated from a culinary high school and has been employed as a cook "lots of places." She has also worked in warehouses. It appears from the Pretrial Services Report that she receives little or no financial help to support her four children from their fathers. Nevertheless, the defendant is a daily marijuana user. Substance abuse treatment she participated in beginning in 2016 in connection with a Family Court proceeding did not succeed in the long term.

**The Nature and Seriousness of the Danger.** The primary danger that defendant Harrison poses is the substantial risk of serious physical injury that may occur as a result of her determination to harm the victim AUSA in retaliation for his role in two separate prosecutions of Ramos. A federal prosecutor serves an important role in the legal system, and the defendant's history and characteristics show that she knew she had selected a high-profile, high-stakes target for retaliation. The evidence of the defendant's course of conduct shows that she intended to draw the AUSA to her in secret, and the Court concludes her plan was to inflict more than mere emotional distress. The defendant is not the kind of person to

employ half measures, and the risks she ran were too high for her intent merely to have been to embarrass the AUSA by compromising him through sexual contact. She planned to inflict, or to help someone else to inflict, a serious physical injury on the AUSA.

In summary, the Court finds clear and convincing evidence in the totality of the circumstances, including defendant Harrison's old stabbing conviction, her history of intense animosity toward the victim AUSA (as evidenced by her referring to him as the "white devil") along with the planned-massacre tip and the seizure of firearms, fully-loaded magazines, and ammunition, the defendant's use of aliases, her attempts to use sex to draw the AUSA to her in secret, her false exculpatory excuses that she had fallen in romantic love with the AUSA, to all be critical to assessing the course of conduct that underlies the cyberstalking charge. The Court concludes the defendant intended her salacious communications to draw the AUSA to her in secret so that the AUSA could be physically harmed.

Defendant Harrison claims that her conduct was not nearly as serious as the United States maintains, and stresses that she did not explicitly threaten the victim AUSA. But the argument ignores the circumstances in which the defendant acted; having demonized the AUSA along with family members of Ramos, she acted to reassure the AUSA and to tried to draw the AUSA closer to her in secret. She intended to seriously harm the AUSA and is therefore dangerous.

The Court has carefully reflected on whether releasing defendant Harrison on a combination of conditions even more stringent than those set by Magistrate Judge

Schroeder would reasonably protect the public and the victim AUSA pending her trial. Although it is a close call, the Court finds no combination of conditions will suffice to overcome the strong probability that the defendant will participate in criminal activity to inflict a serious physical injury or death on the AUSA. A GPS monitor is easily disabled, and all the possible conditions of release the Court could impose combined depend largely on voluntary compliance. The audacity of the defendant's effort to retaliate against the AUSA that she and a violent associate's family members had demonized, when viewed in light of all of the surrounding circumstances, and in light of the reasonable inferences to be drawn from those circumstances, lead the Court to conclude she must be detained pending trial.

## CONCLUSION

For all of the foregoing reasons, the United States' motion pursuant to 18 U.S.C. § 3145(a) to revoke Magistrate Judge Schroeder's November 7, 2018 oral conditional release order granting pretrial release to defendant Elizabeth Harrison is granted. Defendant Harrison is committed to custody of the Attorney General pursuant to 18 U.S.C. § 3143(e) for confinement in a correctional facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The Attorney General shall afford the defendant a reasonable opportunity for private consultation with counsel. This ruling is without prejudice to the defendant's right to the presumption of innocence, and to her right, pursuant to 18 U.S.C. § 3142(f), to seek reconsideration of her pretrial detention

based upon changed circumstances.

**SO ORDERED.**

_Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

Dated:  December 6, 2018